**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JEFFREY HUDSON,** | : | **Civil No. 4:12-CV-1255** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **GUARDSMARK, LLC,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

## I.  INTRODUCTION

This action presents a dispute between Jeffrey Hudson and his former employer, Guardsmark, LLC.  Hudson is a former security guard for Guardsmark, which among other things provides security services for companies engaging in oil and natural gas exploration in the Commonwealth of Pennsylvania.  Hudson represents that he suffers from anxiety and depression, and alleges that Guardsmark discriminated against him on the basis of his mental health disabilities.  Hudson further alleges that Guardsmark failed to accommodate his disability, retaliated against him on the basis of his disability, and eventually terminated his employment in violation of the Americans with Disabilities Act and the Pennsylvania Human Relations Act.

Guardsmark has moved for summary judgment on Hudson's claims, arguing that Guardsmark honored each of Hudson's requests for accommodation, and that the decisionmakers who ultimately decided to terminate Hudson's employment were entirely unaware of his purported disabilities. The plaintiff, in contrast, argues that employees of the defendant, including his manager, met his requests for workplace accommodation with hostility and discriminatory comments, and that they made derogatory comments to Mr. Hudson's supervisors about his medical conditions and need for time off of work. The plaintiff maintains that there is evidence to show that the defendant's eventual decision to terminate his employment was discriminatory, and that the non-discriminatory bases given for his termination were pretextual.

The parties have each filed two briefs in support of, and opposition to, the motion. The parties have also filed competing factual statements, which are themselves filled with numerous instances of the parties parsing and endeavoring to explain the facts presented and their significance to this case. Thus, in addition to answering the defendant's factual record, the plaintiff has identified 146 separate factual assertions with citation to record evidence, which the plaintiff contends make summary judgment unwarranted.

On the basis of this hotly disputed factual record, a record marked in some material respects by confusion, contradiction and controversy, we conclude that, with

the exception of the plaintiff's failure-to-accommodate claim, the parties have jointly

demonstrated the existence of myriad issues of disputed fact, and thus questions

regarding the plaintiff's claims for discrimination and retaliation must be resolved in

this case by a factfinder, not by the court on summary judgment. Accordingly,

mindful of standard of review which governs the court's assessment of the pending

motion, and construing all facts and the reasonable inferences that can drawn from

them in the plaintiff's favor, the motion for summary judgment will be granted in part

and denied in part.

## II.    **<u>BACKGROUND</u>**[1]

Jeffrey Hudson is a 43 year-old male who lives in McElhattan, Pennsylvania.

(Doc. 37, Pl. Counterstatement of Facts, ¶ 1)  Hudson is a high school graduate and

served in the military from 1989 until 2009, when he was honorably discharged. (<u>Id.</u>,

¶¶ 2-3.)  Guardsmark is a national company that provides a variety of security

services to clients, including oil and gas companies operating in the Commonwealth

of Pennsylvania. (Doc. 33, Def. Statement of Facts, ¶ 1)  One of Guardsmark's

---

[1] The factual background is taken from the parties' competing submissions of undisputed facts, to the extent the facts are admitted or otherwise undisputed. In addition, the facts have been taken in the light most favorable to the plaintiff as the nonmoving party, with all reasonable inferences drawn in his favor. However, nothing in this background will be taken to conclusively establish any fact that may ultimately be the subject of dispute at trial.

clients is Anardarko Petroleum Corporation, which operates a facility in Williamsport, Pennsylvania. (Id., ¶ 2.) Hudson was hired by Guardsmark as a security guard on November 4, 2010, and was hired to work as a security guard on Anadarko work sites. (Doc. 37, Pl. Counterstatement of Facts, ¶ 4; Doc. 35, ¶ 10)

According to the plaintiff, he suffers from certain serious mental health conditions, including anxiety and depression, and these conditions required him periodically to take time off of work in 2011 while he sought medical treatment. Hudson was diagnosed more than a decade ago with anxiety, and was more recently diagnosed in the summer of 2011 with depression. During the hiring process, Hudson informed Doug McKinney, a former Guardsmark manager, that he suffered from anxiety. (Doc. 37, ¶ 6) According to Hudson, he informed McKinney about his condition because he wondered whether his anxiety diagnosis would affect his chances of securing employment or affect his ability to complete his responsibilities as a security guard. (Id.)

During his time of employment with Guardsmark, Hudson worked as a security officer at various locations until his employment was terminated on August 27, 2011. (Id., ¶ 7.) Among his job duties, Hudson was responsible for guarding the worksite perimeter, greeting visitors, and securing the site. (Id., ¶ 8.) During his employment, Hudson was supervised by, among others, Kaitlyn Deinarowicz, who was a senior

supervisor who was later promoted to Relationship Manager. (Id., ¶ 9 and Def. Response to Counterstatement, ¶ 9.) Ms. Deinarowicz was not the plaintiff's direct supervisor, but supervised the salaried supervisors, who in turn directly supervised the plaintiff. (Doc. 37, Pl. Counterstatement of Facts, ¶ 9; Doc. 39, Def. Response, ¶ 9) The salaried supervisors who were Hudson's direct supervisors included Matthew Winslow, Ron Yeagle, and Eric Paplarin. These supervisors reported to Deinarowicz. (Doc. 37, Pl. Counterstatement of Facts, ¶ 10) Deinarowicz was responsible for preparing the plaintiff's work schedule. (Id., ¶ 20.)

Prior to commencing his employment, the plaintiff received a two-hour training session, which was supplemented with on-the-job training throughout the course of his time with Guardsmark. (Id., ¶ 12.) Hudson's first assignment was at a work location known as the Texas Blockhouse, and this assignment lasted three or four months. (Id., ¶ 13.) Typically throughout his employment, Hudson worked 12-hour shifts, two or three days per week. (Id., ¶ 14.)

In June 2011, Hudson requested and took two weeks off of work because of his mental health conditions. (Id., ¶ 21.) During this time, Hudson provided the defendant with a medical excuse for his absences from work. (Id., ¶ 22.) In addition, Hudson testified that he was absent from work approximately six or seven other times because of his mental health needs. (Id., ¶ 23.) According to Hudson, every time he

needed to take time away from work to deal with his health, he contacted the defendant, and informed his supervisors of the reason for his absence. (Id., ¶ 24.) Hudson attested that he specifically informed Deiairowicz about his need for time off to deal with his anxiety, and that when he informed Mr. Paplarin, his supervisor would in turn inform Deinarowicz. (Id., ¶¶ 26-27.) On one of these occasions, Hudson provided Paplarin with a medical note to excuse the absence, and Paplarin provided a copy of the doctor's note to Deinarowicz. (Id., ¶ 28.) Hudson claims that this same pattern of notice was provided to Mr. Yeagle. (Id., ¶ 29.) Hudson attests that during his conversations with Deinarowicz about his anxiety and need for time off, he observed Deinarowicz to be visibly upset about the requests, and that she informed him that he was "missing a lot of time" and that she was "tired of finding people to fill in for you." (Id., ¶ 32.)

Upon his return from a medical absence in June 2011, the plaintiff's work assignment was changed and he began working at the COP 728 Tank Farm, where he worked until August, 2011, when his employment was terminated. (Id., ¶ 37.) The plaintiff was reassigned to the Tank Farm primarily because he had asked to be transferred to a busier work location, a request he made approximately three months earlier. (Doc. 35, ¶ 31; Doc. 37, Pl. Response, ¶ 31)

Hudson did not receive any discipline of any kind for the first six months of his employment, and Hudson's supervisors concluded that he performed his job satisfactorily during this time. (Doc. 37, Pl. Counterstatement of Facts, ¶ 38) Neither Yeagle nor Paplarin ever observed the plaintiff to be rude or disrespectful during work, but instead found that he acted in a professional manner. (Id., ¶ 39.) However, shortly after Mr. Hudson informed Ms. Deinarowicz that he was suffering from anxiety and needed to take some time off of work to treat the condition, he was subjected to three instances of discipline. (Id., ¶ 40; Doc. 39, Def. Response, ¶ 40.)

In one instance, on May 26, 2011, Deinarowicz told Eric Paplarin to issue Hudson a written sanction for failing to wear proper protective gear on site, even though Ms. Deinarowicz did not observe the plaintiff on that day. (Doc. 37, Pl. Counterstatement of Facts, ¶ 41) According to the plaintiff, he was issued this discipline despite the fact that Deinarowicz had previously told him that he did not need to wear protective gear at that particular job site. (Id., ¶ 42.) Hudson interpreted the contradiction between what he understood was permissible and the discipline he received to be evidence that he was disciplined because of his absence from work to treat his anxiety, and the defendant's desire to get rid of him. (Id., ¶ 44.) The defendant disputes this conclusion, and points to evidence showing that other Guardsmark security officers were routinely disciplined for failing to wear proper

uniforms. (Doc. 39, Def. Response, ¶ 44 and Ex. U) Nevertheless, the plaintiff testified that he observed other employees at work sites who did not wear protective clothing, and they were not were not disciplined. (Doc. 37, Pl. Counterstatement of Facts, ¶ 45)

In addition to requesting time off for his mental health needs, Hudson also requested that he be permitted to work at a site that was busy, instead of a site where there were no other employees, contractors, or visitors with whom he could interact. (Id., ¶ 49.) According to Hudson, the absence of such opportunities for interaction could lead to anxiety and resulting panic attacks. (Id.) However, Hudson says that Deinarowicz told him that she could not transfer him to another site because he was "missing a lot of time" and because she was not responsible for setting his schedule. (Id., ¶ 50.) The plaintiff made a similar request to supervisor Winslow, and received a similar response, namely, that the request could not be honored because he was missing too much time from work. (Id., ¶¶ 51-52.) Instead of being granted his choice of an active worksite, the plaintiff attested that he was moved from site to site for a few days at a time. (Id., ¶ 53.) The defendant has submitted evidence to show that this was a normal and routine practice for assigning workers to job locations. (Doc. 39, Def. Response, ¶ 53 and Ex. V)

Guardsmark admits that it never met with Hudson to discuss his accommodation requests, and did not refer him to speak with the company's human resources department on this matter. (Doc. 39, Pl. Counterstatement of Facts, ¶¶ 56-67; Doc. 39, Def. Response, ¶¶ 52-53) Instead, some months after he initially made the request, Hudson was eventually transferred to work at a busier worksite, the Tank Farm. The facts regarding this eventual transfer are the subject of dispute between the parties. (Id. ¶¶ 59-61.)

Guardsmark maintains a written progressive discipline policy, which includes steps of discipline, including: a written or verbal warning for first offenses; a write up for a second offense; a three-day suspension for a third offense; and termination following a fourth offense. (Doc. 37, Pl. Counterstatement of Facts, ¶ 62 and Ex. P) This policy was not followed in every instance. (Id., ¶ 63; Doc. 39, Def. Response, ¶ 64) In the plaintiff's case, he was not suspended prior to being terminated; instead, he was terminated following his third offense. (Id., ¶ 64.) The parties agree that there have been instances where other security guards have violated company rules or even broken the law, but have not received discipline for the conduct. (Doc. 37, Pl. Counterstatement of Facts, ¶ 68) As a supervisory employee, Deinarowicz was empowered to suspend and terminate Guardsmark employees, and in fact did have some involvement in employee terminations. (Id., ¶¶ 72-77.)

On August 18, 2011, Mr. Hudson was working on the Anadarko site at the Tank Farm.  (Id., ¶ 78.)  James Hansel is the Regional Security Manager for Anadarko.  On August 18, 2011, Hansel went to the site with Michael Martin, Guardsmark's vice president of operations.  (Id., ¶ 79.)  According to the plaintiff, on that day he approached Mr. Hansel and said, "How are you doing today?"  (Id., ¶ 80.)  Hudson claims that Hansel responded by saying, "do you know who I am?"  (Id., ¶ 81.)  There followed an exchange in which Mr. Hudson confirmed that he knew who Mr. Hansel was, but when Mr. Hansel asked whether Hudson was going to sign him into the site, Hudson said he was not supposed to, and then Mr. Hansel left.  (Id., ¶ 82.)

This encounter apparently led to Guardsmark's eventual decision to terminate the plaintiff's employment on August 27, 2011.  Although the parties now seem to agree that Mr. Hudson did not do anything during this exchange that was inappropriate, (Id., ¶ 85), it also appears that as the result of this brief encounter, Mr. Hudson was issued written discipline and counseling from Mr. Yeagle, at Ms. Deinarowicz's direction.  (Id., ¶¶ 86-87.)  The factual detail regarding the decision to discipline the plaintiff for this incident, and the ultimate decision to terminate his employment, is somewhat unclear from the evidence in the record.

According to Hudson, at the site where he was working on August 18, 2011, security guards were not required actually to sign in any visitors, and instead had to come out of the guard shack and make contact with the visitor. (Id., 89-90.) If a security officer knows Mr. Hansel, they are not required to ask who he is or to ask him to identify his business purpose. (Id., ¶ 91.) Prior to August 2011, Mr. Hudson had met and interacted with Mr. Hansel, and thus was not required to ask him for his identity and business purpose on the site, and both Mr. Winslow and Ms. Deinarowicz acknowledged as much. (Id., ¶¶ 92-94.)

Nevertheless, in Guardsmark's response to Mr. Hudson's later filed charge with the Equal Employment Opportunity Commission, the company stated that Hudson was disciplined for "failing to properly ask personnel about signing log-in sheet." (Id., ¶ 95 and Ex. O.) The response further stated that "[a]ll security officers working at this location must require all visitors, contractors and employees to sign in if they enter or leave the site" and that Mr. Hudson "failed to require the client's Regional Security Manager, Jim Hansel, to sign in upon entering the site." (Id., ¶ 96 and Ex. O.)

Guardsmark's EEOC response also stated that "Hansel complained to Guardsmark Relationship Manager Kaitlyn Deinarowicz about [Hudson's] failure to follow sign-in procedures" and that "Deinarowicz then spoke to [Hudson] who

admitted such conduct." (Id., ¶ 97.) However, during this litigation, Deinarowicz admitted that she never spoke to Mr. Hudson about his August 18, 2011, interaction with Mr. Hansel, or about anything related to the sign-in procedures on that date. (Id., ¶ 98 and Ex. R.)

Thus, despite the fact that security guards at the Tank Farm were apparently not required to sign-in anyone, Hudson may have been disciplined for not signing in Mr. Hansel, and the written discipline he received states that Hudson "did not properly ask personnel about signing log in sheet." (Id., ¶ 99.)

The plaintiff highlights the fact that during this litigation, Guardsmark actually changed its position and claimed that Mr. Hudson failed to properly ask Mr. Hansel about the purpose of his visit; Guardsmark clarifies this by asserting that it has not actually changed its position, but merely "learned more about what occurred over the course of the discovery process." (Id., ¶ 100; Doc. 39, Def. Response, ¶ 100.) The evidence also shows that, at best, Guardsmark was inconsistent in disciplining security guards who were found to have violated the company's sign-in procedures. (Doc. 37, Pl. Counterstatement of Facts, ¶ 101; Doc. 39, Def. Response, ¶ 101) Mr. Yeagle testified that other than Mr. Hudson, he was unaware of any other security officer who was terminated for failing to follow sign-in procedures. (Doc. 37, ¶ 102) Prior to instructing Mr. Yeagle to discipline Mr. Hudson for the incident on August

18, 2011, Ms. Deinarowicz never spoke to Mr. Hudson to learn his version of the events, and neither Yeagle nor Deinarowicz observed Hudson violate any sign-in procedures.  (Id., ¶¶ 103-14.)

For his part, Hudson claims that the reasons that have been given for his termination vary widely.  He attests that he was specifically informed that the reason he was being disciplined was for failing to refer to Mr. Hansel as "sir".  (Id., ¶ 105.) He also attested that the disciplinary document that was provided to him during his deposition differed materially from the document that he was actually provided on August 18, 2011, and he thus maintains that the disciplinary document that was provided to him during discovery was fabricated, forged, or otherwise altered to make it appear that he had really been disciplined for failing to follow sign-in procedures. (Id., ¶ 106.)

According to Hudson, Mr. Hansel sent an email to one of Hudson's supervisors, Mr. Winslow, to advise him about his interaction with Hudson at the Tank Farm on August 18, 2011.  Winslow then called Mr. Hudson to speak to him about the sign-in procedures for that particular job site.  (Id., ¶ 108.)  Winslow then spoke to Hudson about the interaction, but never mentioned anything about failing to follow proper sign-in procedure.  (Id., ¶ 109.)  Hansel also contacted Deinarowicz and informed her about the interaction.  (Id., ¶ 110.)  However, Hansel never

recommended that Guardsmark remove, discipline, or terminate Mr. Hudson's employment.  (Id., ¶ 111.)

Nevertheless, after Mr. Winslow spoke to Mr. Hudson about his interaction with Hansel, he informed Ms. Deinarowicz about what Mr. Hudson had said, and Deinarowicz told him to type up a statement about the conversation and send it to John Davis, Guardsmark's Accounts Manager.  Winslow did so by email.  (Id., ¶ 113.)  Thereafter, Deinarowicz called John Davis and explained the situation to him. (Id., ¶ 114.)

In August 2011, Deinarowicz was supervised by Michael Dunn, Guardsmark's Branch Manager, and also by John Davis, the Accounts Manager.  (Id., ¶ 119.) Following the incident involving Mr. Hansel, Mr. Dunn was provided with copies of all instances of written discipline that had been issued to the plaintiff at Deinarowicz's direction.  (Id., ¶ 120.)  Then, in late August, with participation and consultation from Deinarowicz, Winslow, and Davis, Dunn made the decision to terminate the plaintiff's employment with Guardsmark.  (Id., ¶¶ 122-128.)  On a Guardsmark payroll status form, it is indicated that Mr. Hudson's employment was terminated because he "could not follow proper site sign in procedures" and does not indicate that Hudson was terminated for having a poor attitude or because he was unprofessional.  (Id., ¶ 129.)

Deinarowicz was the supervisory employee who told Hudson that his employment was being terminated. (Id., ¶ 136.) According to Deinarowicz, Mr. Hudson was terminated from employment because there was no other work available for him. (Id., ¶ 137.) However, Hudson attested that during his conversation with Deinarowicz, she told him that he was being fired because he was absent from work too often. (Id., ¶ 138.) Mr. Hudson says that he responded to this information by explaining that he had provided doctor's excuses for his absences, which were due to medical conditions that he could not help. (Id., ¶ 139.) Mr. Hudson claims that Deinarowicz responded to this explanation by dismissively saying "whatever," and informing him that he was also being terminated for not being clean shaven and for not calling Mr. Hansel "sir". (Id., ¶¶ 140, 142.) For his part, Dunn attested that he never told Deinarowicz to tell Mr. Hudson that the reason he was being terminated was that he missed too much time from work, and he never told Deinarowicz that he was being let go because he had a bad attitude. (Id., ¶¶ 132-33.)

Guardsmark admits that Deinarowicz never told Mr. Hudson that his employment was being terminated because there was no other work available for him, although that too now seems to be a nondiscriminatory reason that has been provided for the decision to terminate the plaintiff's employment. (Id., ¶ 145.) As the foregoing suggests, the factual details leading up and surrounding the ultimate

decision to terminate Mr. Hudson's employment, and the way in which this decision was reached and ultimately handled are the subjects of some level of dispute between the parties and within the factual record, and particularly with respect to what role, if any, Deinarowicz played in instigating or influencing the discipline and termination decisions that were ultimately made. (Doc. 35, ¶¶ 50-66; Doc. 37, Pl. Response, ¶¶ 50-66)

## III.　PROCEDURAL HISTORY

The plaintiff initiated this action by filing a complaint on June 29, 2012. (Doc. 1) The plaintiff thereafter amended the complaint on January 22, 2013, and the defendant filed its answer on January 25, 2013. (Docs. 23, 24) On April 22, 2013, Guardsmark filed its motion for summary judgment. (Doc. 33) The parties filed multiple briefs in support of and opposition to the motion, with the defendant filing an initial brief and a reply brief, as well as directing the Court to recent Supreme Court case law that Guardsmark believed to have relevance to this case. (Docs. 34, 38, 44) For his part, Hudson filed an initial brief in opposition to the motion, as well as a sur-reply brief. (Docs. 36, 43) In addition, the parties submitting competing factual recitations in support of their respective positions, and to contest the facts offered by the opposing party, including citation to the evidence developed during the discovery process in this case. (Docs. 35, 37, 39)

## IV. STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure provides as follows:

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a). For purposes of Rule 56, a fact is material if proof of its existence of nonexistence might affect the outcome of the suit under the applicable substantive law. Haybarger v. Laurence Cnty. Adult Prob. & Parole, 667 F.3d 408, 412 (3d Cir. 2012) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). For an issue to be genuine, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Id. (quoting Anderson, 477 U.S. at 248-49).

Accordingly, in support of a motion for summary judgment, the moving party must show that if the evidence of record were reduced to admissible evidence in court, it would be insufficient to allow the non-moving party to carry its burden of proof. See Celotex v. Catrett, 477 U.S. 317, 323 (1986). Provided the moving party

has satisfied this burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007). Instead, if the moving party has carried its burden, the non-moving party must then respond by identifying specific facts, supported by evidence, which show a genuine issue for trial, and may not rely upon the allegations or denials of its pleadings. <u>See</u> Martin v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007); <u>see also</u> Fed. R. Civ. P. 56(c).

In adjudicating the motion, the court must view the evidence presented in the light most favorable to the opposing party, <u>Anderson</u>, 477 U.S. at 255, and draw all reasonable inferences in the light most favorable to the non-moving party, <u>Big Apple BMW, Inc. v. BMW of North America, Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992). Where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true. <u>Id.</u> Additionally, the court is not to decide whether the evidence unquestionably favors one side or the other, or to make credibility determinations, but instead must decide whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. <u>Id.</u> at 252; <u>see also</u> <u>Big Apple BMW</u>, 974 F.2d at 1363. In reaching this determination, the Third Circuit has instructed that:

> To raise a genuine issue of material fact . . . the opponent need not match, item for item, each piece of evidence proffered by the movant. In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. It thus remains the province of the factfinder to ascertain the believability and weight of the evidence.

Id. In contrast, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation marks omitted); NAACP v. North Hudson Reg'l Fire & Rescue, 665 F.3d 464, 476 (3d Cir. 2011).

## IV.   **DISCUSSION**

Guardsmark argues that it is entitled to summary judgment for three reasons. First, the defendant contends that the plaintiff's claim that Guardsmark failed to reasonably accommodate his disability fails because even assuming that the company was aware of the disability, it honored each request that the plaintiff made. In this regard, Guardsmark maintains that after the plaintiff requested to be transferred and stationed at a busier work site, this request was honored by transferring the plaintiff

to the Tank Farm, and the plaintiff was granted time off of work for his medical needs upon request.

Second, Guardsmark argues that the plaintiff's claim that he was terminated because of his anxiety and depression fails as a matter of law because the undisputed evidence shows that John Davis and Michael Dunn, who Guardsmark claims made the decision to remove Hudson from the Anadarko account and to terminate his employment with Guardsmark were completely unaware of the plaintiff's disabilities. Therefore, Guardsmark argues, neither Davis nor Dunn could have harbored discriminatory animus towards the plaintiff.

Finally, Guardsmark argues that it has proffered legitimate, non-discriminatory reasons for terminating the plaintiff's employment, namely his repeated violation of Guardsmark rules and his negative attitude towards Guardsmark's client, Anadarko. Accordingly, Guardsmark insists that the plaintiff's retaliation claim fails as a matter of law.

### A.    The ADA and Workplace Discrimination[2]

---

[2]  The plaintiff has also brought parallel claims alleging unlawful discrimination in violation of the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. Ann. §§ 951 et seq.  The legal standards and analysis applicable to ADA claims is substantively identical to discrimination claims under the PHRA.  See Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 382 (3d Cir. 2002) (noting that the statutes are interpreted in accord with one another, and "[t]herefore, our disposition of [the plaintiff's] ADA claim applies with equal force to his PHRA

Under the ADA, "no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA defines a qualified individual with a disability as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Finally, the Act defines a "disability" to mean "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). In this case, the parties agree, at least for purposes of summary judgment, that the plaintiff's long-standing diagnosis with anxiety, and his more recently diagnosed depression, constitute disabilities that would fall within the protections of the ADA.

---

claim."); Kelly v. Drexel Univ., 94 F.3d 102, 105-06 (3d Cir. 1996) ("Pennsylvania courts . . . generally interpret the PHRA in accord with its federal counterparts."). The defendant has, accordingly, combined its arguments in favor of summary judgment with respect to the plaintiff's federal and state claims, and we will address the plaintiff's ADA and PHRA claims collectively.

To establish a prima facie case of discrimination under the ADA, a plaintiff must show that: (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999) (quoting Gaul v. Lucent Technologies, 134 F.3d 576, 580 (3d Cir. 1998) (citing Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir. 1996))) (internal quotation marks omitted); see also Williams v. Philadelphia Housing Auth. Police Dept., 380 F.3d 751, 761 (3d Cir. 2004).

"Adverse employment decision[s]" under the ADA may include not only termination of a plaintiff's employment, but also an employer's refusal to make reasonable accommodations for a plaintiff's disabilities. See id. In this regard, the ADA specifically provides that an employer "discriminates" against a qualified individual with a disability when the employer does " 'not mak[e] reasonable accommodations to the known physical or mental limitations of the individual unless the [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer.' " Taylor, 184 F.3d at 306 (quoting 42 U.S.C. § 12112(b)(5)(A)) (alterations in original).

Importantly, "[r]easonable accommodation" further "includes the employer's reasonable efforts to assist the employee and to communicate with the employee in good faith," Mengine v. Runyon, 114 F.3d 415, 416 (3d Cir. 1997), under what courts refer to as a "duty to engage in the 'interactive process' " required by the ADA, Williams, 380 F.3d at 761. The applicable regulations provide that "[o]nce a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. pt. § 1630 app. 1630.9 at 359.

The regulations also observe that "[t]o determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability . . . [in order to] identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3).

The Third Circuit has explained that the "interactive process must include sufficient notice to inform the employer that an employee is requesting an

accommodation followed by good faith participation of the employer and employee in that interactive process." Conneen v. MBNA America Bank, N.A., 334 F.3d 318, 330 (3d Cir. 2003). In order for a plaintiff to hold an employer liable for a breakdown in this mandatory interactive process, he must show that (1) the employer knew about his disability; (2) he requested accommodations or assistance for his disability; (3) the employer did not make a good faith effort to assist him in seeking accommodations; and (4) he could have been reasonably accommodated but for his employer's lack of good faith. Conneen, 334 F.3d at 330-31. However, it is also clear that the alleged inadequacy of an interactive process, standing alone, will not support an ADA claim. Quite the contrary, an alleged "failure to participate in the interactive process is not a ground for liability unless the employee has proven a failure to accommodate." Whelan v. Teledyne Metalworking Products, 226 F. App'x 141, 147 (3d Cir. 2007).

## B.    Plaintiff's Discrimination Claims

In this case, the plaintiff alleges that Guardsmark violated the ADA not only by disciplining him and terminating his employment in August 2011, but also for failing to engage meaningfully in an interactive process to assess what reasonable accommodations might have been available in response to the plaintiff's request that he be stationed at a work location that provided greater opportunity to interact with

others, because isolation or working in an inactive environment triggered the plaintiff's anxiety and could induce panic attacks. Additionally, the plaintiff alleges that his supervisors, in particular Ms. Deinarowicz, were dismissive, demeaning, and condescending about his disability, and made negative or disparaging comments about his health problems and his asserted need to miss work to address his health.

As a threshold matter, to the extent the plaintiff premises an ADA claim on the quality of the interactive process which led to accommodation of his transfer and time-off requests, this claim fails since the "failure to participate in the interactive process is not a ground for liability unless the employee has proven a failure to accommodate." Whelan v. Teledyne Metalworking Products, 226 F. App'x 141, 147 (3d Cir. 2007). Moreover, to the extent that the plaintiff suggests that the three-month delay between his request to be stationed at a busier work location and his eventual transfer to the Tank Farm site could constitute a discriminatory failure to accommodate, we disagree. Although the plaintiff has asserted that supervisory employees like Deinarowicz were aware of his disability and did not interact meaningfully with him to find a suitable accommodation, and failed to accommodate him for a period of three months, any claim predicated solely on the brief delay in assigning the plaintiff to the Tank Farm fails to show discrimination under the facts of this case. Numerous courts faced with similar claims have held that brief periods

of delay in providing requested reasonable accommodations are insufficient to show discrimination. See, e.g., Kintz v. United Parcel Service, Inc., 766 F. Supp. 2d 1245, 1256-57 (M.D. Ala. 2011); Terrell v. USAir, Inc., 955 F. Supp. 1448, 1454 (M.D. Fla. 1996) (three-month delay in implementing accommodation was not unreasonable as a matter of law); Hartsfield v. Miami-Dade Cnty., 90 F. Supp. 2d 1363, 1373 (S.D. Fla. 2000) (finding a delay of a few months was not unreasonable, even when considering that some of the delay was due to lost paperwork); Ungerleider v. Fleet Mortgage Grp. of Fleet Bank, 329 F. Supp. 2d 343, 355 (D. Conn. 2004) ("[F]ailure to immediately provide [plaintiff] with the reasonable accommodation that she sought does not constitute refusal to provide a reasonable accommodation . . . .").

Likewise, in this case the plaintiff has not come forward with sufficiently probative evidence showing that the period of three months that he claims to have waited for a preferable  transfer to a more active duty station could support a claim for workplace discrimination or a violation of the ADA.  Instead, the evidence shows that the plaintiff's requests for a transfer and for the ability to take time off to treat his mental health needs were, in fact, honored.  Our view of these facts, even in the light most favorable to the plaintiff, does not reveal sufficient evidence to show that the

defendant failed to interact meaningfully to find an accommodation that was, in fact, provided.[3]

However, upon review of the briefs and the parties' voluminous and competing factual recitations in this case, we do find that there remain disputed issues of fact with respect to the plaintiff's claim that Guardsmark's termination of the plaintiff's employment constituted discrimination on the basis of his disability. It is emphasized that many of the facts that are relevant to this claim are squarely disputed, as are the inferences that the parties believe may, or may not, be drawn from those facts. In concluding that factual disputes exists that preclude summary judgment on the plaintiff's discrimination claims, we express no opinion as to what those facts may ultimately demonstrate at trial, but only conclude that the dispute causes summary judgment to be unwarranted and requires that the claims be presented to a factfinder.

This case essentially rests on the plaintiff's claim that he was disciplined, and ultimately terminated in August 2011, in a discriminatory manner, following his encounter with Mr. Hansel at the Tank Farm on August 18, 2011. The defendant insists that this claim must fail as a matter of law because the decisionmakers who ultimately determined to terminate the plaintiff's employment were entirely unaware

_____

[3] Likewise, it appears essentially undisputed that the plaintiff's requests for time off of work in 2011 were honored without incident, and that there were no occasions where any Guardsmark employee denied his accommodation requests.

of his disability. The plaintiff does not dispute that these supervisors, Messrs. Davis and Dunn, did not know about his mental health conditions. However, he argues that the facts of record could show that his termination was initiated and directly influenced by Ms. Deinarowicz, who was undisputedly aware of his condition, harbored discriminatory animus regarding his disability, had expressed frustration about having to accommodate the plaintiff's need for medical leave, disciplined him immediately following his return from leave, and admittedly spoke with the ultimate decisionmakers about the plaintiff's termination before it was decided upon.

As noted, in order to establish a claim for discrimination under the DAA, a plaintiff must establish that he "(1) has a 'disability' (2) is a 'qualified individual' and (3) has suffered an adverse employment decision because of that disability." Turner v. Hershey Chocolate U.S., 440 F.3d 604, 611 (3d Cir. 2006) (citing Buskirk v. Apollo Metals, 307 F.3d 160, 166 (3d Cir. 2002); Gaul v. Lucent Technologies, Inc., 134 F.3d 576, 580 (3d Cir. 1998).

If a plaintiff meets that initial burden, the court needs to consider whether the plaintiff has come forward with direct or circumstantial evidence of discrimination. If the plaintiff has direct evidence of discrimination, then the court uses what is referred to as a "mixed motive" theory, meaning that the plaintiff must show only that the allegedly unlawful motive was a substantial motivating factor in the adverse

employment action. <u>Shellenberger v. Summit Bancorp, Inc.</u>, 318 F.3d 183, 187 (3d Cir. 2003).

However, in cases where a plaintiff has come forward only with circumstantial evidence of discrimination, then the court uses a pretext theory, which essentially tracks the burden shifting analysis first announced in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973); <u>see also</u> <u>Lawrence v. National Westminster Bank N.J.</u>, 98 F.3d 61, 68 (3d Cir. 1996) (in ADA cases, courts apply the Title VII burden shifting analysis).

Under <u>McDonnell Douglas</u>, once a plaintiff has established a *prima facie* case of discrimination, the burden of production switches to the defendant, who must "articulate some legitimate, nondiscriminatory reason" for the adverse employment decision. <u>McDonnell Douglas</u>, 411 U.S. at 802. If the defendant produces legitimate, nondiscriminatory reasons for its employment action, the burden returns to the plaintiff to demonstrate that the defendant's proffered reasons are merely pretext for discrimination. <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994). In order to defeat a motion for summary judgment under this framework, a plaintiff must identify some evidence from which a "factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause

of the employer's action." Id. at 764. The Third Circuit has explained that in order to prove pretext, a plaintiff may rely on, inter alia, a defendant's credibility or lack thereof, the timing of an employee's termination, and evidence of disparate treatment. See, e.g., Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644-45 (3d Cir. 1998) (ADEA case) (citing Fuentes, 32 F.3d at 765). Also potentially relevant is evidence of inconsistent reasons provided as the basis for workplace discipline. See Zelinski v. Pa. State Police, 108 F. App'x 700, 707 (3d Cir. 2004).

In this case, the parties dispute both whether the plaintiff has come forward with direct evidence of discrimination, and also whether the plaintiff has come forward with sufficient evidence to demonstrate that the defendant's proffered justification for his termination was pretextual. However, regardless of what analytical lens we apply, we find that disputed material issues of fact cloud this claim and preclude summary judgment.

Regarding direct evidence of discrimination, the plaintiff argues that there is evidence in the record to show that Ms. Deinarowicz had made express comments to the plaintiff and others that she was frustrated with the plaintiff's need for time off of work in order to deal with his asserted medical needs, and that she exhibited a dismissive and disparaging demeanor when the plaintiff maintained that he needed the time off of work to treat his anxiety. Moreover, the plaintiff asserts that when he

asked why he was being let go, Ms. Deinarowicz told him that it was because he was missing too much time from work, even though she knew that he had taken time off to address a matter relating to his mental health disability. Thus, not only does this alleged statement contradict what Guardsmark claims is the true reason for the plaintiff's termination, but it could further demonstrate that Ms. Deinarowicz harbored discriminatory animus towards the plaintiff. Although this direct evidence is by no means overwhelming, we do agree with the plaintiff that the existence of this evidence in the record provides some direct support for his claim that he was disciplined and eventually terminated for reasons that were discriminatory.

We also agree with the plaintiff that even if Deinarowicz's alleged statements are not sufficient to constitute direct evidence, they would nonetheless constitute circumstantial evidence of unlawful discrimination. Although the defendant attempts to insulate itself from liability in this case by insisting that the decision to terminate the plaintiff's employment was ultimately made exclusively by Messrs. Davis and Dunn, other evidence in the record shows that this decision was reached following consultation with Ms. Deinarowicz, who the plaintiff claims had made comments that were discriminatory, and who in fact told him that he was being fired for missing work, even though this is not what Guardsmark ultimately said was the reason for his termination. Even if she is asserted to be a non-decisionmaker with respect to the

plaintiff's firing, she was apparently the principal decisionmaker with respect to his prior instances of discipline that immediately followed his request for time off for medical reasons, and her apparent communication with Messrs. Davis and Dunn regarding the plaintiff's employment could be found relevant in this case.

Furthermore, the plaintiff has highlighted disputes in the record about the reasons that were given for his termination, principally between what he claims he was told by Ms. Deinarowicz and what the defendant now maintains were the nondiscriminatory reasons for his dismissal. These alleged inconsistent proffered reasons may also have a bearing on the issue of pretext. In this case, the plaintiff has identified multiple instances when he claims Ms. Deinarowicz told him not only that he was being terminated because he missed too much time from work, but also that she told him that he was absent from work too much and that she was tired of finding a replacement for him. He also claims that she complained to other supervisors about the plaintiff's absences, which were apparently based on medical need. This evidence could also be relevant to a jury's consideration of whether a discriminatory reason was a factor in Guardsmark's decision to terminate, which may have been influenced by Ms. Deinarowicz. (Doc. 137, Pl. Counterstatement of Facts, ¶¶ 32-34, 138)

There is also evidence to show that Guardsmark failed to adhere to its own progressive discipline policy, and that the policy may have been applied more harshly

and arbitrarily with respect to the plaintiff than to other employees. To be sure, there is a dispute in the record regarding this issue, and the defendant has presented evidence that many other employees were subjected to similar instances of discipline for similar conduct, but a dispute nonetheless exists that may have a bearing on a factfinder's assessment of the claims in this case. (Doc. 137, Pl. Counterstatement of Facts, ¶¶ 62-65)

Additionally, the record seems to contain contradictions or inconsistencies with respect to the reasons that were given at various times, and by various individuals, for the termination of the plaintiff's employment. Mr. Dunn indicated the plaintiff was terminated because he had received three written disciplines. Ms. Deinarowicz claims that the plaintiff was terminated because there was no work available for him at any other work sites serviced by Guardsmark. In the defendant's interrogatory responses, the company indicates that the plaintiff was terminated due to receiving write-ups and because he was deemed to be unprofessional. Other evidence shows that the defendant has previously indicated the plaintiff was terminated for failing to follow proper sign-in procedures at the Tank Farm site. In marked contrast, Hudson has attested that he was told that he was terminated because he missed too much time from work, and even because he did not refer to Hansel as "sir" during their brief encounter in August 2011. (Doc. 137, Pl. Counterstatement of Facts, ¶¶ 131-145)

Upon consideration of the foregoing, the Court finds that the evidence at least gives rise to a number of disputed issues of material fact that may bear on the actual reason for the plaintiff's termination, or otherwise have bearing on the question of whether the defendant's stated nondiscriminatory reasons for terminating the plaintiff were pretextual. Accordingly, summary judgment on the plaintiff's discrimination claims is unwarranted in this case.

## C.    Plaintiff's ADA Retaliation Claims

The plaintiff has also brought a claim alleging that he was retaliated against for attempting to exercise his rights under the ADA, for requesting to take time off to treat his anxiety or depression, and in seeking a reasonable workplace accommodations.

The ADA provides that "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual has made a charge . . . under [the ADA]." 42 U.S.C. § 12203(a). Accordingly, "it is unlawful for an employer to retaliate against an employee based upon the employee's opposition to anything that is unlawful under the ADA." Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 188 (3d Cir. 2003). Although requesting a reasonable accommodation does not appear to "fit[] within the literal language of the statute," Soileau v. Guilford of Maine, Inc., 105 F.3d 12, 16

(1st Cir. 1997), the Third Circuit has held that making a good-faith request for accommodation is protected activity for purposes of the ADA's anti-retaliation provision, <u>see</u> <u>Shellenberger</u>, 318 F.3d at 191.

In order to make out a *prima facie* case of illegal retaliation under the ADA, a plaintiff must show (1) protected employee activity, (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal relationship between the protected activity and the adverse action. <u>Williams v. Philadelphia Housing Auth. Police Dept.</u>, 380 F.3d 751, 759 (3d Cir. 2004); <u>Fogleman v. Mercy Hosp., Inc.</u>, 283 F.3d 561, 567-68 (3d Cir. 2002). The burden shifting framework of <u>McDonnell Douglas</u>, summarized above, also applies to ADA retaliation claims. In all cases involving retaliation, a plaintiff must prove that retaliatory animus played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process. <u>Krouse v. Am. Sterilizer Co.</u>, 126 F.3d 494, 501 (3d Cir. 1997). This ultimate burden always remains with the plaintiff. <u>Id.</u>

The Third Circuit has thus summarized the showing a defendant must make in order to obtain summary judgment on a claim of ADA retaliation:

> [T]he employer must show that the trier of fact could not conclude, as a matter of law, (1) that retaliatory animus played a role in the decisionmaking process and (2) that it

had a determinative effect on the outcome of that process. This may be accomplished by establishing the plaintiff's inability to raise a genuine issue of material fact as to either: (1) one or more elements of the plaintiff's prima facie case or, (2) if the employer offers a legitimate non-retaliatory reason for the adverse employment action, whether the employer's proffered explanation was a pretext for retaliation.

Id.

In many cases, assessment of a retaliation claim will be focused on the third step, i.e., whether a causal relationship can be demonstrated. Williams, 380 F.3d at 759 n.3. Such is the case here, where there seems to be no dispute that the plaintiff engaged in activity protected under the ADA, and was ultimately subjected to an adverse employment action both in the form of written discipline and eventual termination shortly after he engaged in such activity. The question is thus whether the plaintiff has sufficient evidence to show that a causal relationship exists between the protected activity and the adverse action.

As with the plaintiff's discrimination claim, we believe that there exist disputes in the evidence that warrant denying summary judgment on the plaintiff's retaliation claim. The plaintiff asserts that there is evidence of a causal connection between his request for ADA accommodations and the adverse employment actions that followed, arguing in the first instance that the timing of the discipline he received is compelling. The plaintiff notes that he took time off of work in the spring and summer of 2011,

including two weeks in June 2011, all of which was taken to address his mental health needs. The plaintiff notes that he was thereafter promptly subject to discipline – after having been discipline free for the first six months of his employment – including the eventual termination of his employment two months after making accommodation requests.

The Third Circuit has observed that "the mere fact that adverse employment action occurs after [a protected activity] will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997) abrogated on other grounds by Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006). However, the Third Circuit has also clarified that if the timing of allegedly retaliatory action is " 'unusually suggestive' of retaliatory motive" a causal link may be inferred. Krouse, 126 F.3d at 503 (citing Robinson, 120 F.3d at 1302). In some cases, the appeals court has found that a period of two days demonstrated a causal link, Jalil v. v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989), but has found that a period of two months was not, see Williams, 380 F.3d at 760.

The law in this field is somewhat opaque, and the appeals court has also noted that there is some contradiction in the court's own jurisprudence about the probative value of proximity in retaliation cases, remarking that the case law is " 'seemingly

split' as to whether temporal proximity between the protected activity and the alleged retaliatory act can be sufficient in itself to create an inference of a causal connection for purposes of a prima facie case of retaliation." Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000). The court nevertheless cautioned that the apparent inconsistency in the court's analysis is "not an inconsistency . . . but is essentially fact-based." Thus "we have ruled differently on this issue . . . depending, of course, on how proximate the events actually were, and the context in which the issue came before us." Id. In this inquiry, the court's case law sets "no limits on what we have been willing to consider" in order to evaluate whether there is a sufficient showing of causation to support a retaliation claim.

In this case, we do not agree with the plaintiff that the evidence of temporal proximity alone compels a finding that he has satisfied his burden of showing causation. However, we agree that there is sufficient evidence to support an inference of causation in this case, and therefore summary judgment is inappropriate. In addition to temporal proximity, factors that may be relevant include whether there is evidence of a pattern of antagonism following the protected activity and where the employer has given inconsistent reasons for the adverse employment action taken. See Farrell, 206 F.3d at 281. These factors are relevant here.

In this case, the plaintiff has come forward with evidence to show that he was subjected to discipline shortly after he sought to take medically necessary leave in the spring and summer of 2011, that he was subjected to disparaging comments by his manager specifically related to his absence from work, and was eventually terminated from his employment for reasons that have not always been consistently explained by Guardsmark and its employees. This apparently pattern of conduct, and the unsettled reasons given for the plaintiff's discipline and termination, coupled with the timing of this discipline, is sufficient evidence to sustain the plaintiff's burden at this stage to show evidence of causation. Thus, we conclude that summary judgment on the plaintiff's retaliation claim is unwarranted for many of the same reasons that summary judgment on the ADA discrimination claims is also inappropriate, and the facts that bear upon both of these claims are subject to disputes that require resolution at trial.

## V.    **CONCLUSION**

For the foregoing reasons, the defendant's motion for summary judgment will be granted with respect to the plaintiff's failure-to-accommodate claim, but denied in all other respects.

An separate Order shall issue with this memorandum.

*MARTIN C. CARLSON*
United States Magistrate Judge